(No. 34106.—

THE PULLMAN COMPANY, Appellant, *vs.* ROY F. CUMMINS, Director of Labor, *et al.,* Appellees.

*Opinion filed January 24, 1957—Rehearing denied March 19, 1957.*

GARDNER, CARTON, DOUGLAS, ROEMER & CHILGREN, of Chicago, (HERBERT S. ANDERSON, ERWIN W. ROEMER, MARSHALL R. WENDT, JAMES A. VELDE, and LAURENCE A. CARTON, of counsel,) for appellant.

LATHAM CASTLE, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, and A. ZOLA GROVES, of counsel,) for appellees.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

Plaintiff appeals directly to this court from a judgment of the circuit court of Cook County entered as a declaratory judgment under the Civil Practice Act finding that the plaintiff's complaint fails to state a cause of action and holding that the Illinois statute requiring semimonthly payment of wages (Ill. Rev. Stat. 1955, chap. 48, pars. 36-37a,) applies to and forbids payment of wages by plaintiff as computed under certain proration rules contained in the plaintiff's collective bargaining agreements with its sleeping-car porters and conductors. The judgment also specifically found that said statute is not in conflict with the Railway Labor Act and does not violate the interstate or supremacy clauses of the United States constitution. Inasmuch as the validity of an Illinois statute and a construction of the Federal constitution are directly in issue in this case the appeal properly comes direct to this court.

The plaintiff's complaint describes plaintiff's business, the unique character of the terms of employment of its porters and conductors and the collective bargaining agreements between the plaintiff and labor organizations representing such employees. It further states the proration rules in the collective bargaining agreements which require that in computing an employee's compensation his service hours are prorated between two months when a trip and his assigned layover extend from one month to the next. It is alleged that the purpose and effect of the proration rules are to stabilize the monthly payments to employees. The complaint further alleges that the Illinois semimonthly pay statute, originally enacted in 1913, has never been enforced against the computation of payments under the proration rules, although the rules have been in the porters' agreement since 1937 and in the conductors' agreement since 1945. It is also alleged that the Illinois statute does not forbid the computation of such payments but that the

present Director of Labor of the State of Illinois intends to attempt to enforce the statute against the proration rules. Provisions of the Railway Labor Act are cited in the complaint with an allegation that the application of the Illinois statutes to these payments would conflict with the regulation of interstate commerce by Congress in the Railway Labor Act and would violate the interstate commerce (art. I, sec. 8) and supremacy (art. VI) clauses of the United States constitution. The complaint further alleges that the defendants may seek to impose upon the plaintiff the severe criminal penalties of the Illinois statute with a resulting multiplicity of suits and irreparable damage to the plaintiff, and that an adjudication that the statute validly forbids payments computed under the proration rules would subject the plaintiff to penalties of thousands of dollars every half month. The complaint concludes that an actual controversy therefore exists between plaintiff and the defendants and prays for a declaratory judgment (1) that the statutory requirement of prompt and frequent wage payments does not forbid the computation of hours and wages under proration rules in the union contracts between plaintiff and its employees; (2) that if the statute forbids such computation under the union contracts it would conflict with the Federal Railway Labor Act and violate the interstate commerce and supremacy clauses of the United States constitution; and (3) prays for an injunction restraining the defendants from attempting to enforce the statute against the proration rules as relief incidental to such declarations.

Defendants filed a motion that the complaint be stricken and the cause dismissed with prejudice on the grounds that the complaint stated no cause of action, that the Illinois statute is in all respects constitutional and not in conflict with the Railway Labor Act, and that the provisions of the collective bargaining agreements do not prevent the enforcement of the Illinois statute.

After a hearing on said motion wherein the defendants conceded that a declaratory judgment was a proper remedy in the instant case, the trial court sustained the defendants' motion to dismiss the complaint and entered the judgment presently appealed from.

The provisions of "An Act in relation to the semi-monthly payment of wages and salaries by corporations for pecuniary profit, and providing penalty for violation of same" as amended in 1955, (Ill. Rev. Stat. 1955, chap. 48, pars. 36-37a), so far as pertinent to a decision of this case, are as follows:

"§ 1. Every corporation for pecuniary profit engaged in any enterprise or business within the State of Illinois, shall at least semi-monthly pay to every employe engaged in its business all wages or salaries earned by such employe during the semi-monthly pay period; all wages or salaries earned by such employe during such pay period shall be paid to such employe by such corporation not later than 13 days after the end of the semi-monthly pay period. * * * No corporation coming within the meaning of this act, shall by special contract with employes or by any other means secure exemption from the provision of this act. * * *

"§ 2. Any corporation coming within the meaning of this act willfully violating section 1 of this act, shall be guilty of a misdemeanor and fined not less than $25.00 nor more than $100.00 for each separate offense and each and every failure or refusal to pay each employe the amount of wages due him or her at the time, or under the conditions required in Section 1 of this act, shall constitute a separate offense.

"§ 3. The Department of Labor, shall administer and enforce the provisions of this Act. Upon complaint to the Director of Labor that a provision of this Act has been violated, the Director or his deputies shall have access to

all accounts, records and memoranda pertaining to the wages and salaries of employes of such corporation."

From the details alleged in the complaint and admitted by the defendants' motion to dismiss, it appears that since its organization as an Illinois corporation in 1867 plaintiff has engaged in the business of operating sleeping cars for railroad passengers throughout the United States and Canada. Its principal office and place of business is in Chicago. It employs approximately 1600 conductors and 7400 porters, attendants, maids and bus boys in its system. All employees' pay records are at its principal office where the wages are computed and the pay checks distributed.

As a "sleeping-car company," plaintiff is within the definition of "carrier" in the Railway Labor Act (45 U.S.C. 151-164) as originally enacted by Congress in 1926 and as since amended.

Pursuant to section 2 of the Railway Labor Act, which makes it the duty of a carrier and its employees to make and maintain agreements concerning rates of pay and other matters, the plaintiff for some years has entered into collective bargaining agreements with employees represented by labor organizations. The Brotherhood of Sleeping Car Porters represents porters, attendants, maids and bus boys and the Order of Railway Conductors and Brakemen of America represents the conductors in plaintiff's service. Each of the organizations is a labor union authorized to represent the employees under the Railway Labor Act. The porters' agreement of November 25, 1952, as revised on September 15, 1954, and the conductors' agreement of December 20, 1950, as revised on January 3, 1955, were each in effect on the date of the complaint.

The schedules of work and the basis of pay of the employees differ from those of railroad or factory employees. Railroad employees ususally work for short distances, approximately 150 to 200 miles. Plaintiff's employees operate from the point of origin to the destination of a trip

which may amount to over 2000 miles one way. Factory employees usually work 8 hours a day and are paid overtime beyond 8 hours a day and 40 hours a week. The collective bargaining agreements covering plaintiff's employees provide for the payment of overtime on a monthly rather than a daily or weekly basis. Other distinctive practices for these employees include a monthly guarantee of pay, layovers between trips, and special methods of compensation according to agreed formulas, such as the proration rules. The pay provisions of these collective bargaining agreements are extremely complex, elaborate, and technical. Since the payments under the proration rules of such contracts are here challenged as illegal under the statute in question it is necessary to explain the general features of the contract pay provisions.

A basic month's service of 205 hours for each calendar month is provided for in each agreement with a monthly rate of pay assigned to the basic month's service. Payments of this kind are said to be guaranteed because the agreements provide that no deduction is made from the monthly wage when the employee works fewer hours than the basic month's service. Payments for the basic month's service are made semimonthly, such payments being not later than 13 days after the end of the half month period to which it is credited.

Under the agreements, overtime service constitutes those hours in excess of a basic month's service for which the hourly rate of pay is the monthly rate divided by the number of hours pay in the basic month's service. At the end of each calendar month, when it is determined that the service hours exceed the basic month's service, the excess hours are credited to the employee for that month. The overtime rate for porters is the regular hourly rate from 205 to 240 hours, and time and one-half for hours in excess of 240 hours. The overtime rate for conductors is the regular hourly rate from 205 to 215 hours and time

and one-half for hours in excess of 215. Overtime is paid within 13 days after the end of the calendar month in which the overtime hours have been worked.

Prorated service hours result from the proration rules, the legality of which is here in issue. The proration rule in the porters' agreement reads: "In regular assignments, where the days credited for the last trip in the month extend into the succeeding month, the service hours in the trip shall be prorated by allowing 6:50 hours' credit for each day credited in the month in which the trip was started and crediting the balance of the hours to the succeeding months, * * *."

Similarly, the conductors' agreement provides: "Where the days credited for the last round trip (lap over trip) in the month extend into the succeeding month, the service hours of the trip shall be prorated by allowing 7 hours' credit for each day credited in the month in which the trip was started (including day of departure if reporting time on such day was before noon). The balance of the service hours of the trip shall be credited to the succeeding month."

By amendment to the conductors' agreement effective June 10, 1954, the basic month was reduced to 205 hours and the 7 hours' credit became 6:50.

In applying the proration rules one must realize and understand that a specific number of "service days" are assigned to each trip and the proration rules apply only when the trip extends over the end of a calendar month.

An example of the application of the proration rules is given in the complaint which illustrates their operation in an understandable manner. A round trip from Chicago to Tacoma, Washington, is assigned a rate of 11½ service days. A conductor works 39 hours and 15 minutes on the trip out, has a layover of 25 hours and 45 minutes in Tacoma, works 39 hours and 20 minutes on the return trip and then has a layover in Chicago of almost 6 days before he begins another trip. When the round trip, in-

cluding the layover begins and ends in the same month, the service hours for the trip out and for the return trip are all credited to that month and there is no proration of service hours. However, when the trip extends over the end of the month the propration rules are applied. In the example, when the trip begins in Chicago on November 25 at 1:45 P.M. and the conductor returns to Chicago on November 30 at 2:05 P.M. his layover in Chicago does not end until December 6 at 1:45 P.M. Since the conductor's reporting time on November 25 was after noon, five days, from November 26 to 30, are credited to his account for November. The five days are multiplied by 6 hours and 50 minutes per day making a total of 34 hours and 10 minutes credited to his account for November. Since the trip carries a rate of 11½ days, the remaining 6½ days, multiplied by 6 hours and 50 minutes per day for a total of 44 hours and 25 minutes, are credited to the conductor's account for December. In the example, the conductor's total service hours for November, including the prorated hours from the Tacoma trip, were 201 hours and 35 minutes and he would receive a full month's pay for November under the rule guaranteeing 205 hours and no more. However, since the hours credited to his account for December, including those from the Tacoma trip, under the proration rules totalled 215 hours and 50 minutes, he would receive for December not only a full month's pay for 205 hours but also 10 hours at the regular *pro rata* hourly rate and 50 minutes at time and one-half under the overtime provision of the agreement.

The employee is paid for prorated service hours as soon as they can be computed. In the example, there was no overtime for November and the employee would receive only his basic wages for that month, one half being paid within 13 days after the middle of November and the other half within 13 days after the end of November. It could not be known until the end of December whether

the 44 hours and 25 minutes prorated to the conductor's December account from the Tacoma trip, when added to the other hours credited to December, would result in overtime for that month. Such conductor would receive one half of his basic December wage within 13 days after the middle of the month of December and the other one-half within 13 days after the end of December. At the same time, on or before January 13th, the conductor would also receive pay for the 10 hours and 50 minutes of overtime worked in December that are first determinable at the end of December. It is, apparently, the time of payment for these 10 hours and 50 minutes of overtime that is claimed to violate the Illinois statute.

The hours of approximately 6000 of the Pullman Company's employees are computed under the proration rules. The services of approximately 1773 of these employees originate in Illinois and the balance in the other 47 States and Canada. Of those whose services originate outside Illinois and whose service hours are computed under the proration rules, approximately 70 per cent perform their services wholly outside Illinois. The proration rules have been in the porters' agreements since October 1, 1937, and in the conductors' agreement since September 1, 1945.

Until the 1955 amendment of the Illinois statute, no attempt was made by Illinois prosecuting authorities to enforce the statute against the proration rules, but at the hearing defendants' counsel contended that the statute in its pre-1955 form was violated by the proration rules.

Before considering whether or not the interstate commerce and supremacy clauses of the Federal constitution are violated by the Illinois statute as construed by the trial court, it is necessary to determine whether or not the trial court's construction and application of the statute is within the language and intent of the legislative enactment. There is no prior Illinois case construing these provisions or explaining the legislative purpose of similar laws which we

have been able to find or to which our attention has been directed.

It should first be kept in mind that this is a criminal statute of the State of Illinois providing rather onerous penalties. A fine of not less than $25 nor more than $100 is imposed for each offense, and each failure to make a payment to each employee as required by the act is stated to be a separate offense. A criminal statute must be strictly limited in its application to such objects as are obviously within its terms. (*City of Elmhurst* v. *Buettgen,* 394 Ill. 248, 253, and *People* v. *Johnson,* 288 Ill. 442.) In the recent case of *People* v. *Vetri,* 309 N.Y. 401, 131 N.E.2d 568, the statute imposing criminal penalties for failure to pay wages every week was held not to apply to vacation pay but was restricted to the "basic rate of pay." In stressing the strict construction of the statute, the court in the *Vetri case* explained that acts otherwise innocent do not become criminal unless a clear expression of legislative intent makes them criminal, and said at page 572 (N.E.) as follows: "The law affords wage earners ample civil remedies for the purpose of assuring them full payment of all additional benefits accruing to them under their contract of employment. If the Legislature desires to provide that failure to pay vacation moneys or other benefits due an employee be deemed criminal, this purpose can readily be effected by appropriate amendment to the Labor Law or to the Penal Law. Under the language of these statutes as now written, defendant was guilty of no criminal act."

Although the precise holding of the *Vetri* case is not conclusive of the basic issue now before the court, it does illustrate the principle that the application of the Illinois criminal "frequency of pay" statute should be strictly limited to its purpose and its terms.

It is apparent from a reading of the act that the primary purpose and objective of the General Assembly in enacting such legislation was to require frequent and prompt pay-

ment of wages by corporate employers and to prevent corporate employers from avoiding the time requirements of the act by specific contracts. There is no language within the act from which can be inferred any legislative intent to regulate the method of computing the amount of wages due and payable but that is apparently left at the present time to a matter of negotiation and private contract between employer and employee or employee's representative.

Decisions from other jurisdictions have held valid comparable statutes regulating time of wage payments as a protection to employees who require prompt payment of wages for the necessities of life, as was said in *International Textbook Co.* v. *Weissinger,* 160 Ind. 349, 65 N.E. 521: "Delay of payment or loss of wages results in deprivation of the necessaries of life, suffering, inability to meet just obligations to others, and, in many cases, may make the wage-earner a charge upon the public. The situation of these persons renders them peculiarly liable to imposition and injustice at the hands of employers, unscrupulous tradesmen, and others who are willing to take advantage of their conditions." Other cases to substantially the same effect are collected in an annotation to 12 A.L.R. 612.

The basic question to be resolved in this case is whether or not the proration rules in issue are merely part and parcel of a valid private employment contract adopting a formula for determining amount of wages due and payable or whether it is part and parcel of an invalid "special" contract designed to do indirectly what cannot be done directly by postponing the time of wage payments otherwise validly known and ascertained beyond the statutory time limit.

From a consideration of all of the facts alleged in the complaint and the exhibits attached thereto, we are of the opinion that the proration rules are a part and parcel of a complicated formula within a valid privately negotiated contract for the purpose of determining the amount of compensation due and payable under such contract and

that they are not designed or intended to delay time of payment of wages. When the proration rules are considered in connection with the other closely related parts of the wage formula relating to monthly rates of pay for a basic month's service of 205 guaranteed hours, overtime for hours in excess of a basic month, and the number of "service days" assigned to a trip including the layover period as well as hours on duty, it seems apparent that the principal purpose of the proration rules is not to delay time of payment but to stabilize amounts of monthly overtime payments.

A 1945 Presidential Emergency Board in a hearing involving these particular contract provisions as well as others, described proration as the "equitable arrangement" to prevent hours credited for one month from being abnormally high and for the next month abnormally low or *vice versa* merely because a trip extended from one calendar month into the next. A 1950 Presidential Emergency Board, considering the same provisions, said not only that the proration issue was "related to the basis of pay" but that the proration rules were "designed to stabilize conductors' earnings from month to month, and to reduce overtime payments springing from variations of the number of days in the calendar month which produce corresponding variations in the number of trips, when coupled with the fact that fixed credit is allowed for each round trip performed."

The proration rules in issue are an integral part of the wage structure created by the collective bargaining agreements as was indicated by the 1950 Presidential Emergency Board in rejecting the conductors' contention that overtime should be computed on a daily rather than a monthly basis when it said in its report: "Pay rules for Pullman conductors have always been predicated on a month's service, and punitive overtime has always been related to the basic month. Computation of punitive pay on a daily basis,

which is appropriate to factory and office workers whose work day consists of a fixed number of hours, is entirely alien to the whole complex of arrangements under which Pullman conductors operate."

Under these collective bargaining agreements it is apparent that compensation is not earned and payment is not due for prorated service hours until the amount can be computed as provided in the agreements. Such agreements are in fact and in law the only means of determining what compensation the employee earns and when he earns it. The agreements do not mention the time for making payments for prorated service hours but all payments are made by the plaintiff within the statutory period after compensation is earned. This appears from the fact that compensation for the basic month's service of 205 guaranteed hours is paid bimonthly not later than 13 days after the end of each half-month period; overtime compensation apart from proration is not determinable until the end of the month, since overtime consists of the hours credited to the month in excess of the guaranteed monthly hours, and such overtime compensation is paid within 13 days after the end of the month to which it is credited; and similarly compensation for prorated service hours cannot be determined until it is known whether or to what extent such proprated service hours produce overtime for a particular month and the compensation therefor is actually paid within 13 days after the end of the month to which it has been prorated under the terms of the agreement. Under the agreement, monthly overtime payable cannot be computed until the month is over and only then is it possible to determine the payments "earned" or "due" under the Illinois statute for the hours in excess of 205 including any hours carried over from the previous month under the proration rules. The required time of payment under the Illinois statute begins only when the amount of compensation is earned

and due under the terms of the employment, and in our judgment the proration rules here in question do not violate the statute as to required time of payment. If it were held that the Illinois statute invalidates the proration rules, the frequency or time of payment of wages would not be changed for they are paid semimonthly within 13 days after the middle and end of each month, but it is only the amount of overtime due employees that would be changed. As previously indicated, the statute in question is not intended to impose any rules or regulations as to the method of computing wages payable but goes only to the time of payment thereof.

Nor are the collective bargaining agreements, which include the proration rules here in question, the kind of special contract prohibited by the statute. The statute has provided since its original enactment in 1913 that the employer may not by special contract secure exemption from the provisions thereof. In 1913 collective bargaining agreements between employer and employees' unions were not even regarded as enforceable contracts except to the extent incorporated in individual contracts. (*Hudson* v. *Cincinnati Railway*, 152 Ky. 711, 154 S.W. 47; Collective Labor Agreements in American Law, 44 Harv. L. Rev. 572, 581.) The word "contract" or "contract of employment" as used in labor legislation has been held to not include collective bargaining agreements unless the context so indicates. (*J. I. Case Co.* v. *National Labor Relations Board*, 321 U.S. 332, 334-335; *United Electrical Workers* v. *General Electric Co.* 233 F.2d 85, 88-89.) During the period preceding World War I, in which the present legislation was originally enacted, many State legislatures outlawed and forbade certain and various kinds of individual contracts between the employer and individual employees in the belief that "employers had an unfair economic advantage over individual wage earners because of their superior economic

power, including the present control over the means of livelihood in an industrial system and took advantage of such wage earners' absolute necessity to make a living on any terms available * * *." Gregory, Labor and the Law, p. 175; *Coppage* v. *Kansas,* 236 U.S. 1, 68 A.L.R. 1265.

It seems apparent to us that from the historical status of collective bargaining agreements at the time of the adoption of the statute here in issue, and from court decisions involving collective bargaining agreements as "contracts of employment," the legislature did not intend to forbid provisions of collective bargaining agreements such as the proration rules here involved concerning the computation of amounts of wages but the statute was directed to and intended to apply to that certain type of individual contracts between employer and individual employee then prevalent.

From what has heretofore been said we conclude that the Illinois semimonthly pay statute here in issue does not apply to the computation of hours and wages under the proration rules here in issue and the trial court was in error in not so declaring and enjoining the defendants from attempting to enforce the statute against the proration rules. Having reached such conclusion it is unnecessary for this court to consider whether or not the interstate commerce and supremacy clauses of the Federal constitution are violated by the Illinois statute as construed by the trial court.

The judgment of the trial court is reversed and the cause is remanded, with directions to enter a judgment not inconsistent with the views here expressed.

*Reversed and remanded, with directions.*